CHARLES E. MCMANUS III, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McManus v. Commissioner
Docket No. 32442-85.
United States Tax Court
T.C. Memo 1987-457; 1987 Tax Ct. Memo LEXIS 454; 54 T.C.M. (CCH) 475; T.C.M. (RIA) 87457; September 14, 1987. Charles E. McManus III, pro se. Robert A. Miller, for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: The Commissioner determined a deficiency of $ 9,429.21 in petitioner's Federal income tax for his 1981 taxable year. The deficiency was based primarily on adjustments resulting from the disallowance of petitioner's distributive share of losses from Fluid Technology, Inc. ("Fluid Technology"), a subchapter S corporation. The issues we must decide are (1) whether Fluid Technology was carrying on any trade or business in 1981; (2) whether Fluid Technology incurred research and experimental expenditures in 1981 in connection with a trade or business within the meaning of section 174(a)(1); [1] and (3) whether petitioner is entitled to *457 a political contribution credit pursuant to section 24. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner, Charles E. McManus III, resided in Maryland at the time he filed his petition. [3]
Petitioner is an attorney. In 1981, through his professional corporation, petitioner was employed as an associate with a law *458 firm in Lake Charles, Louisiana. Petitioner timely filed a Federal income tax return for his taxable year 1981. D. W. Sanderford is an inventor who developed an instrument called a mud logging device or pressure translator, which monitors critical drilling parameters on an oil well while the well is being drilled. [4] The device has the ability to convert hydrostatic, pneumatic and mechanical pressures into a pneumatic signal that can be transmitted up to 2,000 feet to a computer for instantaneous analysis. The mud logging device enables the driller to detect problems before they develop into major catastrophes and, by analyzing the density, flow rate and temperature of return mud, to determine the likelihood of the presence of oil. In the fall of 1981, Sanderford's work had progressed to the point where he needed to raise money to complete the final *459 stages of development. He wanted to build several devices and place them on actual drilling rigs to work out any problems that might arise. Sanderford, his brother, and a partner in petitioner's law firm decided to create a subchapter S corporation to manufacture the mud logging devices and perform the research and development necessary to bring the system to fruition. In return, the S corporation would receive rental income from the units. In November 1981, petitioner was given the responsibility of forming the corporation. [5] Fluid Technology was incorporated in Louisiana on November 11, 1981 for the purpose of manufacturing ten prototype mud logging devices and performing necessary research and testing. Fluid Technology planned to earn income through rentals of the mud logging devices. Fluid Technology elected treatment as a subchapter S corporation on December 16, 1981. *460 Fluid Technology was capitalized entirely with cash contributions of one dollar per share from 13 investors, including petitioner, totaling $ 262,000.00. Two hundred twelve thousand shares were subscribed on December 16, 1981 and the remaining 50,000 were subscribed on December 29, 1981. On December 2, 1981, Fluid Technology entered into four contracts: (1) a License Agreement with Cybar Corporation ("Cybar"); (2) a Research and Development Contract with Cybar; (3) a Custom Manufacturing Contract with Eufex, Inc. ("Eufex"); and (4) a Maintenance Agreement with Eufex. Cybar is a Texas corporation with its principal place of business at Houston, Texas. Sanderford is the president and majority shareholder of Cybar. Eufex, a Texas corporation with its principal place of business at Houston, Texas, is a wholly-owned subsidiary of Cybar. The contracts became effective on December 16, 1981, with the successful sale of two-thirds of the offered shares in Fluid Technology. The License Agreement provided in relevant part: * * * AGREEMENTS
1. License of Technology.Cybar agrees to grant Fluid and exclusive license to use for the 18-19 months period ending 30 June 1983, its *461 technology relating to the mud logging device. 2. Consideration. In consideration for the exclusive license of its technology to use the mud logging device, Fluid agrees to pay to Cybar twenty-five per cent (25%) of Fluid's gross receipts from rentals of mud logging devices during the 18-19 months period ending 30 June 1983. Payments shall be remitted to Cybar monthly within a reasonable time following the end of each month. 3. Effective Date. This Agreement shall become effective (the "Effective Date") upon successful completion of Fluid's offering of 272,000 [6] of its shares at $ 1.00 cash per share. The offering shall be considered successful when two-thirds of the offering is sold. 4. Collateral Agreements.
4.1 Manufacture and Test Prototype Devices.Fluid agrees to manufacture at least ten prototype mud logging devices and to conduct on-site testing of the ten prototype mud logging devices. 4.3 [sic] Development of Augmentations to Technology.Fluid agrees to perform the research and experimental *462 work necessary to reduce to practice (or to determine to abandon as not practicable) the following augmentations of the mud logging device: * * * 4.5 Intellectual Property. All new, developmental, and improvement patents arising from Fluid's efforts pursuant to this Agreement will be the exclusive property of Cybar. All patents, copyrights, and similar grants shall be promptly assigned to Cybar. Fluid shall assist in the prosecution of all claims and rights created for Cybar by or in connection with Fluid's performance of this Agreement. 4.6 Exercise of Options. At any time subsequent to 31 December 1981 and prior to 1 August 1983, Cybar may exercise an option to purchase from Fluid the ten prototype mud logging devices at a price equal to Fluid's cost, without reduction for depreciation. At any time prior to 1 July 1983, Fluid may exercise an option to merge into Cybar pursuant to a separate Agreement and Plan of Merger. * * * Pursuant to the Custom Manufacturing Contract that Fluid Technology entered into with Eufex, Eufex agreed to procure components and materials and to manufacture the ten prototype mud logging devices required by the License Agreement *463 with Cybar. Eufex was to deliver component parts to Fluid Technology for testing before Eufex assembled the mud logging devices. Fluid Technology agreed to pay Eufex $ 325,000.00, part of which was to be made in progress payments as components were delivered. Eufex issued invoices in the amount of the cost of the components delivered plus overhead in the amount of 150 percent of cost, and Fluid Technology made progress payments of 20 percent of the invoiced amounts. All new, developmental, and improvement patents arising from Eufex's efforts under the contract were to be the "exclusive property of Fluid and its licensor." Under the Maintenance Agreement between Fluid Technology and Eufex, Eufex promised to perform all maintenance work on the mud logging devices for one year following delivery. In return, Fluid Technology agreed to pay Eufex, within three days following the effective date of the contract, $ 4,500.00 per device (or $ 45,000.00), plus one percent of its gross receipts from rentals during 1982. All new, developmental, and improvement patents arising from Eufex's efforts under the contract were to be the "exclusive intellectual property of Fluid and its licensor. *464 " Fluid Technology contracted back with Cybar under the Research and Development Contract to perform all necessary tests with respect to the mud logging devices. In return, Fluid Technology agreed to pay Cybar $ 157,000.00 within three days of the effective date of the contract, plus 15 percent of its gross receipts from rentals during 1982. The Research and Development Contract also provided that all new, developmental, and improvement patents arising from Cybar's efforts under the contract were the "exclusive intellectual property of Fluid and its licensor." The end result of the four contracts was to create a circular arrangement whereby Fluid Technology was required to do nothing but make payments to Cybar and Eufex. Eufex was to acquire component parts, manufacture the prototype mud logging devices and maintain them for one year following delivery. Cybar was to perform all research and development, including testing the component parts that Eufex delivered to Fluid Technology before Eufex assembled the devices. Fluid Technology also acquired no rights in any new technology developed pursuant to the contracts. The Custom Manufacturing Contract, Maintenance Agreement and *465 Research and Development Contract each provide that all new, developmental, and improvement patents arising from the contracts will be the "exclusive property of Fluid and its licensor." The License Agreement, however, provides that "All new, developmental, and improvement patents arising from Fluid's efforts pursuant to this Agreement will be the exclusive property of Cybar," Fluid Technology's licensor. The only right that Fluid Technology acquired pursuant to its agreements with Cybar and Eufex (aside from the right to merge into Cybar) was the right to keep and rent out 10 mud logging devices provided that Cybar and Eufex completed them during the license period and provided that Cybar did not exercise its option under the License Agreement to purchase the devices from Fluid Technology at cost. On December 16, 1981, the effective date of the four contracts, Fluid Technology issued a check for $ 45,000.00 to Eufex pursuant to the Maintenance Agreement. Fluid Technology deducted the full $ 45,000.00 on its 1981 income tax return although no maintenance work was performed in 1981 because no mud logging devices had been delivered. No mud logging devices were ever delivered to Fluid *466 Technology pursuant to its agreement with Eufex. [7]
Fluid Technology issued a check to Cybar on December 16, 1981 for $ 157,000.00 pursuant to the Research and Development Contract. Fluid Technology deducted $ 157,000.00 as a research and development expense on its 1981 return. Fluid Technology claimed a depreciation deduction of $ 1,977.65 on its 1981 return. The deduction represented one month's depreciation on 5-year recovery property placed in service in December 1981 with a cost basis of $ 158,212.20. The assets petitioner claims were placed in service in 1981 are the component parts of mud logging devices that Eufex delivered in December 1981. Fluid Technology made four progress payments to Eufex in 1981 of 20 percent of the amount invoiced under the Custom Manufacturing Contract for components and materials delivered: Date
Amount
December 16, 1981
$ 1,773.84
December 18, 1981 [8]
8,721.93
December 30, 1981
12,441.17
December 31, 1981
8,705.50
*467 The payments to Eufex in 1981 totaled $ 31,642.44, which is 20 percent of $ 158,212.20, the claimed basis for depreciation. Petitioner generally received an invoice from Eufex before issuing a check on behalf of Fluid Technology. Toward the end of the year, however, some invoices were described over the telephone so that Fluid Technology could make payments in 1981 rather than 1982. Fluid Technology anticipated that the prototype mud logging devices would be operational by March 1982 and would generate $ 500.00 to $ 2,000.00 each per day in gross receipts from rentals. Because of problems in developing the necessary computer technology, however, no mud logging devices were operational during the licensing period which expired on June 30, 1983. Cybar, acting pursuant to its Research and Development Contract with Fluid Technology, had not yet succeeded in developing a computer capable of receiving pneumatic signals from pressure translators located in various places on a drilling rig, converting *468 the information into a signal that could be read on a computer screen, and making calculations to enable a drilling rig operator to analyze the mud coming out of a drill hole. Fluid Technology reported no rental income on its 1981 return. Because it had no mud logging devices to rent out at the end of the licensing period, Fluid Technology exercised its option pursuant to the License Agreement to merge into Cybar. Since the merger, Cybar has had two operational units on drilling rigs in the Gulf of Mexico but needs additional capital before it can place additional devices in operation. Due largely to the downturn in the oil industry, however, Cybar has been unable to interest investors in its new technology. The future of the project thus remains in doubt. In addition to the payments under the four contracts in 1981, Fluid Technology paid a corporate franchise tax of $ 10.00 to the Louisiana Department of Revenue and Taxation on December 31, 1981. Fluid Technology deducted the payment as an expense on its 1981 return. Fluid Technology also paid petitioner's law firm $ 1,620.67, allocated $ 1,500.00 to legal fees and $ 120.67 to disbursements. Fluid Technology claimed *469 an amortization deduction of $ 8.20 on its 1981 return. The amortization deduction was computed by treating $ 492.00 of the $ 1,620.67 paid as an organizational expense amortizable over 60 months. The balance of $ 1,128.67 was deducted as a legal expense in 1981. Fluid Technology filed its first return for its taxable year ended December 31, 1981, showing no income and a loss of $ 205,124.52 consisting of the following: Maintenance Expense
$ 45,000.00
Taxes
10.00
Amortization
8.20
Depreciation
1,977.65
Legal
1,128.67
Research and Development
157,000.00
TOTAL LOSS REPORTED
$ 205,124.52
Petitioner claimed an investment tax credit on his 1981 return of $ 1,086.96, based on new recovery property with an other than three year recovery period and an unadjusted basis of $ 10,869.54. The amount claimed is attributable solely to petitioner's interest in Fluid Technology. In his notice of deficiency dated May 22, 1985, respondent disallowed all of petitioner's claimed losses and investment tax the deductions and investment tax credit because Fluid Technology was not engaged in a trade or business during its taxable year ended December 31, 1981. *470 Alternatively, respondent disallowed the depreciation deduction because no assets were placed in service in 1981. Alternatively, respondent disallowed the claimed deductions for maintenance and research and development expenses because Fluid Technology's method of accounting for those expenses did not clearly reflect income. Petitioner also claimed a political contribution credit of $ 50.00. The claimed credit was for a contribution of $ 740.00 made by petitioner's law firm to the law firm's political action committee and charged to petitioner's professional corporation. The law firm made the payment and deducted it from the salary paid to petitioner's professional corporation. Petitioner offered no evidence to substantiate his personal payment of the credit and, in his notice of deficiency, respondent disallowed it. OPINION The threshold issue we must decide is whether Fluid Technology was carrying on any trade or business in 1981. Petitioner can receive the benefit of the deductions and credits at issue only if Fluid Technology was carrying on a trade or business in 1981. Section 162(a) provides a deduction for ordinary and necessary expenses incurred in carrying on *471 a trade or business. Fluid Technology deducted legal expenses for tax advice under section 162(a). Section 164(a) provides a deduction for taxes paid in carrying on a trade or business. Fluid Technology deducted the franchise tax it paid to the State of Louisiana under this section. Section 174(a) provides a deduction for research and experimental expenditures incurred in connection with a trade or business. Fluid Technology deducted maintenance and research and development expenses under section 174(a). In the alternative, petitioner argues that these were ordinary and necessary business expenses incurred in carrying on a trade or business and deductible under section 162(a). Section 168 provides for depreciation of recovery property used in a trade or business beginning in the year in which the property is placed in service. Fluid Technology deducted one month's depreciation on the component parts received from Eufex in 1981 with an unadjusted basis of $ 158,212.20. In the alternative, petitioner claims that the progress payments made to Eufex in 1981 which equal 20 percent of the unadjusted basis for depreciation, of $ 31,642.44, are deductible under section 162(a). *472 Section 248 provides for amortization of organizational expenses over a period of not less than 60 months beginning with the month in which the business begins. Petitioner contends the Fluid Technology began business in December 1981 and is entitled to an amortization deduction pursuant to section 248 on its 1981 return. In spite of its frequent use, neither the Code nor the regulations provide a generally applicable definition of the term "trade or business." The Supreme Court recently reiterated that the question of whether a taxpayer is engaged in a trade or business requires an examination of all of the relevant facts. Commissioner v. Groetzinger,   U.S.   , 107 S. Ct. 980, 988 (1987); see Higgins v. Commissioner,312 U.S. 212, 217 (1941). In applying the facts and circumstances test, courts have focused on three factors indicative of whether a trade or business exists.[9]
*473 First, the taxpayer must undertake an activity intending to make a profit. Drobny v. Commissioner,86 T.C. 1326, 1340 (1986); Green v. Commissioner,83 T.C. 667, 687 (1984). Second, the taxpayer must be regularly and actively involved in the activity. Gajewski v. Commissioner,723 F.2d 1062, 1065 (2d Cir. 1983); Snyder v. United States,674 F.2d 1359, 1364 (10th Cir. 1982). This requirement contemplates extensive business activity over a substantial period of time as opposed to a one-time venture or investment. Stanton v. Commissioner,399 F.2d 326, 329-330 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. [10]
Third, the taxpayer's business operations must actually have commenced. Courts have consistently held that pre-opening and start-up expenses are not deductible under section 162(a). Johnsen v. Commissioner,794 F.2d 1157, 1160 (6th Cir. 1986), revg. on other grounds 83 T.C. 103 (1984); Aboussi v. United States,779 F.2d 424, 428 (8th Cir. 1985); *474 Central Texas Savings and Loan Assn. v. United States,731 F.2d 1181, 1183 (5th Cir. 1984); Madison Gas and Electric Co. v. Commissioner,633 F.2d 512, 517 (7th Cir. 1980); Richmond Television Corp. v. United States,345 F.2d 901, 907 (4th Cir. 1965), vacated per curiam on other grounds 382 U.S. 68 (1965); Goodwin v. Commissioner,75 T.C. 424, 433 (1980), affd. without published opinion 691 F.2d 490 (3d Cir. 1982). See also section 195. In Richmond Television Corp. v. United States, the Fourth Circuit, to which an appeal in this case would lie, set out the generally accepted rule that even though a taxpayer has made a firm decision to enter into a business and over a considerable period of time spent money in preparation for entering that business, he still has not "engaged in carrying on any trade or business" within the intendment of section 162(a) until such time as the business has begun to function as a going concern and performed those activities for which it was organized.
345 F.2d at 907. [11]
*475 Petitioner contends that Fluid Technology began business in December 1981, when it sold the requisite number of shares, entered into contracts with Cybar and Eufex, and made payments out of corporate funds. On December 2, 1981, Fluid Technology entered into four contracts which became effective on December 16, 1981 upon the sale of two-thirds of the offered shares in the corporation. Fluid Technology made payments pursuant to the contracts in 1981. In addition, Fluid Technology disbursed funds for legal fees and a state franchise tax. Fluid Technology also received component parts from Eufex to be used in manufacturing the mud logging devices and, pursuant to the Custom Manufacturing Contract, made progress payments to Eufex. Petitioner argues that Fluid Technology began business and placed assets in service no later than December 16, 1981, when it received $ 212,000.00 cash from its investors for over two-thirds of the offered shares, paid out $ 203,773.84 pursuant to its contracts with Eufex and Cybar, and began to acquire its operating assets from Eufex. Petitioner relies on section 1.248-1(a)(3), Income Tax Regs., which distinguishes the mere formation of a corporate *476 entity from the date when it actually begins to function as a business: The determination of the date the corporation begins business presents a question of fact which must be determined in each case in light of all the circumstances of the particular case. The words "begins business," however, do not have the same meaning as "in existence." Ordinarily, a corporation begins business when it starts the business operations for which it was organized; a corporation comes into existence on the date of its incorporation. Mere organizational activities, such as the obtaining of the corporate charter, are not alone sufficient to show the beginning of business. If the activities of the corporation have advanced to the extent necessary to establish the nature of its business operations, however, it will be deemed to have begun business. For example, the acquisition of operating assets which are necessary to the type of business contemplated may constitute the beginning of business. [Emphasis added.]
The regulation, however, does not help petitioner because Fluid's activities never "advanced to the extent necessary to establish the nature of its business operations." Fluid Technology *477 was organized to manufacture and rent out 10 prototype mud logging devices and to perform necessary research and testing, and it expected to earn income only through its rental activities. Although in 1981, Fluid Technology had entered inot contracts and begun to acquire component parts for use in manufacturing the mud logging devices, the devices never became operational. Throughout its existence, Fluid Technology never rented devices or tested them. Fluid Technology did not acquire any of its operating assets in 1981. Petitioner asserts that Fluid Technology nonetheless had a depreciable asset once it paid for a component part even though the part was not yet included in the mud logging prototype because Fluid Technology was involved in a research and development project and had to "test everything along the way to make sure we would work out any intermediate bugs before we got the final product." The basis for depreciation (and also for investment credit purposes) was computed based on Fluid Technology's accrual of amounts due Eufex under the Custom Manufacturing Contract. Fluid Technology was not in a position in 1981 to engage in business, and it did not engage in any *478 business in 1981. First, only some of the component parts of the mud logging devices were acquired by Fluid Technology in 1981. Second, these components had to be tested before they could be used to assemble the devices that were intended to be the focus of Fluid Technology's business, and Cybar, not Fluid Technology, performed all research and testing. Third, in 1981 and prior to its merger with Cybar, Fluid Technology performed no work other than paying Cybar and Eufex. The contracts that Fluid Technology had no duties other than to make payments and acquired no rights except for the right to rent out devices if Cybar and Eufex completed them within the license period and Cybar did not elect under the License Agreement to purchase them from Fluid Technology at cost. Consequently, the assets to be used in Fluid Technology's business were not acquired by Fluid Technology because they were never assembled. Moreover, even if, as petitioner claims, business assets could be deemed to be acquired as Fluid Technology acquired component parts, Fluid Technology could not begin to depreciate the assets in 1981 because they were not in a state of readiness to be used in either manufacturing *479 of or rental of mud logging prototypes, i.e., they were not "placed in service." Section 1.46-3(d)(1)(ii), Income Tax Regs.; Simonson v. United States,752 F.2d 341 (8th Cir. 1985); Cooper v. Commissioner,88 T.C. 84, 113-114 (1987). Section 195 provides that pre-opening or start-up expenses are not fully deductible in the year incurred and must be amortized over a period of not less than 60 months beginning with the month in which the taxpayer begins business. Respondent argues that all of the expenses Fluid Technology incurred in 1981 are pre-opening expenses which are not deductible in that year because Fluid Technology had not yet begun business. See section 195; Richmond Television Corp. v. United States,345 F.2d 901, 907 (4th Cir. 1965), vacated on other grounds 362 U.S. 68 (1965). We agree. Although Fluid Technology made a firm commitment in 1981 to enter into business and expended funds in furtherance of that goal, it had not "begun to function as a going concern and performed those activities for which it was organized." Richmond Television Corp. v. United States,345 F.2d at 907. Consequently, *480 respondent properly disallowed Fluid Technology's claimed deductions for legal fees pursuant to section 162(a), taxes pursuant to section 164(a), depreciation pursuant to section 168 and amortization of organizational expenses pursuant to section 248. In addition, because it was not in business in 1981, Fluid Technology is not entitled to a section 38 investment tax credit. Fluid Technology also claimed deductions in 1981 pursuant to section 174 for maintenance and research and development expenses incurred "in connection with a trade or business." Section 174(a)(1) [12] provides that research and experimental expenditures incurred during the taxable year in connection with a taxpayer's trade or business may, at the taxpayer's election, be deducted currently rather than capitalized. The Supreme Court has held that to obtain a deduction under section 174, a taxpayer need not currently be engaged in a trade or business. Snow v. Commissioner,416 U.S. 500, 504 (1974). The Supreme Court, however, did not entirely eliminate the "trade or business" requirement from section 174. As we stated in Green v. Commissioner,83 T.C. 667, 686-687 (1984), *481 For section 174 to apply, the taxpayer must still be engaged in a trade or business at some time, and we must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business for purposes of such section. * * * [Emphasis original.] [13]
As we have previously found, Fluid Technology did not begin business in 1981 and was not engaged in carrying on a trade or business in 1981. Fluid *482 Technology, in fact, never began business. Its exclusive license from Cybar to use the technology developed by Sanderford expired in 1983, before any mud logging devices were operational. At that point, Fluid Technology exercised its option under the License Agreement to merge into Cybar and ceased to exist. Because Fluid Technology never began business, it is not entitled to any deductions under section 174. The final issue we must decide is whether petitioner is entitled to a $ 50.00 political contribution credit. Section 24[14] allows a credit not in excess of $ 50.00 for political contributions by individuals to candidates, political action committees or political parties. *483 In 1981, the law firm of which petitioner's professional corporation (the "P.C.") was an employee made a contribution of $ 740.00 to its political action committee which it charged to petitioner's P.C. and deducted from the P.C.'s salary. Respondent argues that petitioner has not met his burden of substantiating his entitlement to the credit. We agree. The contribution was made by or on behalf of petitioner's P.C. and not by petitioner. Petitioner contends that because a corporation may not contribute to a political action committee and may not claim a credit under section 24(a), we should attribute the contribution to him. There is nothing in the record to support petitioner's characterization of the contribution. If an amount was contributed, it was not contributed by petitioner. See also section 24(b)(2) and section 1.41-5, Income Tax Regs.
Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue. Because of our holdings on the first two issues, we do not reach several alternative issues raised by the parties. ↩
2. The Deficit Reduction Act of 1984, Pub. L. No. 98-369, section 471(c)(1), 98 Stat. 494, 826, redesignated former section 41 as section 24 effective for taxable years beginning after 1983. Although in 1981 the applicable provision was in section 41, we will, for convenience, refer to it as section 24↩. 3. Petitioner listed Houston, Texas as his legal residence on his petition. Respondent determined that petitioner's legal residence at the time the petition was filed was in Maryland. For the purpose of an appeal in this case, petitioner does not contest respondent's determination. ↩
4. The mud logging device is attached to the wellhead and used to analyze the rock being drilled through to determine the likelihood of finding oil. The drilling equipment is lubricated with mud and the device analyzes the mud plus rock. Without this technology, the mud must be sent from the well to a laboratory for analysis. ↩
5. Sanderord, together with a partner in petitioner's law firm, had previously set up an S corporation which was not yet fully capitalized. Petitioner discarded the prior corporation and started again with Fluid Technology. Sanderford commenced the work for which Fluid Technology was to provide funding in October or November 1981, before Fluid Technology was formed. ↩
6. The four contracts entered into on December 2, 1981 state that the offering was to be for 272,000 shares. Only 262,000 shares were subscribed. ↩
7. Petitioner conceded that during the 18-19 month license period coinciding with the sole period during which Fluid Technology was in existence, Fluid Technology did not have any complete systems or anything usable. Transcript of Proceedings of February 4, 1987 at Baltimore, Maryland at 37-39. ↩
8. The Stipulation of Facts lists this check as dated December 17, 1981. A copy of the check admitted into evidence, however, indicates that the correct date is December 18, 1981.↩
9. In Commissioner v. Groetzinger,   U.S.   , 107 S. Ct. 980 (1987), the Supreme Court rejected a fourth factor, whether the taxpayer held himself out to others as a provider of goods or services. This Court had previously rejected the goods and services test. See Ditunno v. Commissioner,80 T.C. 362, 371↩ (1983). 10. We need not discuss this requirement because of our decision that Fluid Technology never began business. See infra.↩
11. The Court of Claims and its successor the Court of Appeals for the Federal Circuit in part have rejected Richmond Television Corp. v. United States,345 F.2d 901 (4th Cir. 1965), vacated per curiam on other grounds 382 U.S. 68 (1965) and held that certain recurring expenses necessary to maintain any business enterprise are deductible under section 162 even if incurred before the business is in a position to earn income. El Paso Co. v. United States,694 F.2d 703, 714 (Fed. Cir. 1982); Blitzer v. United States,684 F.2d 874, 880 (Ct. Cl. 1982); Brotherman v. United States,6 Cl. Ct. 407, 409-410 (1984), see also United States v. Manor Care, Inc.,490 F. Supp. 355, 359 (D. Md. 1980). But see Goodwin v. Commissioner,75 T.C. 424, 433 n.8 (1980) affd. without published opinion 691 F.2d 490 (3d Cir. 1982). In Blitzer, the Court of Claims concluded that expenses such as those for organization of the business, salaries, loans and bills are not start-up costs and are not intended to provide benefits extending beyond the year in question. They should, therefore, not be subject to the rule against current deduction of start-up expenses. 684 F.2d at 880. This Court questioned the validity of that analysis in Goodwin v. Commissioner,75 T.C. at 433 n.8, discussing the district court's decision in United States v. Manor Care, Inc.,supra.We are bound in this case to apply the Fourth Circuit's decision on this issue, Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940↩ (1971). 12. SEC. 174. RESEARCH AND EXPERIMENTAL EXPENDITURES. (a) Treatment as Expenses. -- (1) In General. -- A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction. ↩
13. See also Levin v. Commissioner,87 T.C. 698, 724 (1986); Drobny v. Commissioner,86 T.C. 1326, 1340 (1986); Spellman v. Commissioner,T.C. Memo. 1986-403; Hoerrner v. Commissioner,T.C. Memo. 1985-347↩. 14. Section 24 provides, in relevant part: SEC. 24. CONTRIBUTIONS TO CANDIDATES FOR PUBLIC OFFICE. (a) General Rule. -- In the case of an individual, there shall be allowed, subject to the limitations of subsection (b), as a credit against the tax imposed by this chapter for the taxable year, an amount equal to one-half of all political contributions and all newsletter fund contributions, payment of which is made by the taxpayer within the taxable year. (b) Limitations. -- (1) Maximum Credit. -- The credit allowed by subsection (a) for a taxable year shall not exceed $ 50 ( $ 100 in the case of a joint return under section 6013). (2) Verification. -- The credit allowed by subsection (a) shall be allowed, with respect to any political contribution or newsletter fund contribution, only if such contribution is verified in such manner as the Secretary shall prescribe by regulations. * * *
Prior to 1984, this provision was found in section 41. See note 2, supra.↩