HENRY A. WALL AND LAVINA WALL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wall v. Commissioner
Docket No. 32788-88
United States Tax Court
T.C. Memo 1991-611; 1991 Tax Ct. Memo LEXIS 658; 62 T.C.M. (CCH) 1425; T.C.M. (RIA) 91611; December 10, 1991, Filed *658 An appropriate order will be issued. Lloyd S. Myster, for the petitioners. Jack Forsberg, for the respondent. GOLDBERG, Special Trial Judge. GOLDBERG
MEMORANDUM OPINION This case was heard pursuant to the provisions of section 7443A(b)(3) of the Internal Revenue Code of 1986. [1]
Respondent determined the following deficiencies in and addition to petitioners' Federal income tax attributable to the partial disallowance of their distributive share of depreciation and disallowance of their distributive share of energy credit from Independent Energy Systems - (I) (hereafter IES - (I) or the Partnership). Addition to Tax
Year
Deficiency
Section 6659
1979
$ 2,403
-
1980
917
-
1982
1,141
$ 342
Respondent also determined that petitioners are liable for additional interest under section 6621(c) *659 at the rate of 120 percent of the adjusted rate established under section 6621(b) for the taxable year 1982. In his notice of deficiency, respondent disallowed all but $ 630 of the $ 8,914 partnership loss claimed by petitioners with respect to their investment in IES - (I) on the ground that the Partnership property was overvalued. Respondent raised in his answer the issues of additional interest and an addition to tax for 1979 under the provisions of sections 6621(c) and 6659, respectively, resulting from the energy credit carryback to that year. Respondent raised, on brief, the issue of petitioners' entitlement to their distributive share of a full year's (as opposed to a fractional part of a year's) cost recovery for 1982. On brief and at trial, respondent argued that petitioners were not entitled to energy credit or depreciation because the property in question was not "new section 38 property," within the meaning of section 48(b)(1). In the alternative, respondent argued that no depreciation or energy credit was allowable because the Partnership property was not placed in service in 1982. Finally, respondent argued on brief that no energy credit was allowable because the *660 Partnership property did not constitute "energy property," within the meaning of section 48(1)(2)(A). For the tax year 1982, IES - (I) filed Form 1065, the partnership income tax return, claiming an ordinary loss of $ 49,239, which included $ 42,000 depreciation. IES - (I) listed $ 280,000 as the cost or other basis of its depreciable property, which it recovered under the Accelerated Cost Recovery System of section 168 (ACRS). The recovery percentage provided in section 168(b)(1) for 5-year recovery property was 15 percent, yielding $ 42,000 first year's depreciation. Schedule K-1 of Henry A. Wall (hereafter petitioner) reflected his 7.07-percent distributive share of partnership loss as $ 3,481. Petitioner's share of the unadjusted basis of recovery property treated as eligible for the energy credit was $ 19,796. Application of the 10-percent energy percentage yielded an energy credit of $ 1,980, which was claimed by petitioner in 1982. As a result of the examination of the partnership return of IES - (I), respondent determined that the basis of the Partnership's depreciable property was overstated. Respondent allowed only $ 8,914 of the Partnership's loss deduction. Consequently, *661 respondent determined that petitioner's share of that loss was $ 630. In addition, respondent disallowed all of the energy credit from IES - (I). The parties have agreed that the issue of valuation and related issues of additional interest and addition to tax shall be addressed in the following cases: Laurington Energy Properties, Independent Energy Systems, Inc., A Partner Other Than the Tax Matters Partner, docket No. 13639-90; Independent Energy Systems - (I), Independent Energy Systems, Inc., A Partner Other Than the Tax Matters Partner, docket No. 13700-90; and Independent Energy Systems - (II), Independent Energy Systems, Inc., A Partner Other Than the Tax Matters Partner, docket No. 13699-90. The remaining issues for our decision are (1) whether respondent properly determined that petitioners' distributive share of the energy credit attributable to the IES - (I) property should be disallowed, and (2) whether respondent properly determined that petitioners' distributive share of ordinary loss from IES - (I) was $ 630. Respondent's determinations in the notice of deficiency are presumed correct. Petitioners have the burden of proving otherwise. Rule 142(a). However, respondent *662 has the burden of proof concerning increases in the deficiencies asserted in his answer. Rule 142(a). Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated by this reference. Petitioners resided in Mountain Lake, Minnesota, when they filed their petition. In 1982, petitioner purchased a 7.07-percent share in IES - (I), a limited partnership which acquired the rights to produce, lease, and sell certain components of an on-farm energy plant, designed to produce energy from farm products in order to provide fuel and utilities for farms. Petitioner contracted to buy his interest for $ 20,000 and to pay interest at the rate of 8 percent on the unpaid balance, but has made only $ 6,750 of his required contribution to IES - (I). In 1982, when petitioners filed their joint Federal income tax return, they attached Form 3468, Computation of Investment Credit, and claimed an energy credit of $ 1,980 as their distributive share of partnership energy credit of IES - (I). They also claimed a full year's cost-recovery deduction under the section 168 Accelerated Cost Recovery System (ACRS) for their interest in the equipment *663 owned by the Partnership. Petitioner is a farmer and works for Balzer Manufacturing, a maker of farm equipment. There he met Martin Tonn, who was president and general manager at Balzer Manufacturing. Mr. Tonn, who has worked for 30 years in the business of manufacturing farm equipment, is the developer of the on-farm energy plant, a system intended to produce alcohol and fuel gas from farm products, primarily corn and field waste, for use in operating equipment and heating and electrifying farms. Mr. Tonn holds three patents for inventions of energy-related farm equipment, including a solar grain drying system. The on-farm energy plant is a three-stage system consisting of (1) equipment for the production of fuel-grade alcohol from grain and crop residue produced on the farm, (2) an engine set consisting of an engine coupled directly to electric generators to produce electricity and heat for farm use, and (3) equipment for gasification of farm waste. In 1981, Mr. Tonn transferred the prototype on-farm energy plant, which he was in the process of designing, to Laurington Corporation, which was wholly owned by him. He then created three limited partnerships to which Laurington *664 Corporation sold the components of the three interrelated stages of the energy plant. His purpose was to raise funds to begin the manufacture of the on-farm energy plant. The three limited partnerships were Laurington Energy Properties, created in 1981, Independent Energy Properties - (I), created in 1982, and Independent Energy Properties - (II), created in 1983. These were formed under the 1976 Uniform Limited Partnership Act, Minn. Stat. Ann. sec. 322A.01 (West 1981). Mr. Tonn also organized a corporation, Independent Energy Systems, Inc., of which he owned 49 percent of the stock, to serve as general partner in the limited partnerships. He prepared a prospectus himself and sold interests in these partnerships to investors, petitioner among them. According to the prospectus and limited partnership agreement, IES - (I) was to lease and sell farm energy equipment similar to the prototype which it owned. This equipment was to be manufactured by another corporation formed by Mr. Tonn, Interstate Energy Enterprises. IES - (I) was the owner of three properties, to which the following values were assigned in the prospectus. The values were arrived at by use of the capitalization *665 of income method: Induction Electrical Generating System
$ 160,000
Hot Water Heating System
80,000
Mash Separating and Drying System
40,000
TOTAL
$ 280,000
The other two partnerships held the equipment in the other two stages of the energy plant, Laurington Energy Properties holding the alcohol producing equipment and Independent Energy Systems - (II), the gasification equipment. In 1982, Laurington Corporation entered into a royalty agreement with IES - (I), according to which Laurington Corporation agreed to pay IES - (I) 2 percent of net sales and 2 percent of pre-tax profits derived from the sale of the equipment owned by both Laurington Energy Properties and IES - (I). Mr. Tonn attempted, through Interstate Energy Enterprises Corporation (IEE), to acquire a manufacturing facility in Kiel, Wisconsin. Initially the property was leased from Seifert Manufacturing, but eventually it was purchased. In 1983, IEE became involved in a dispute with Seifert, the vendor of the property, who in that year declared bankruptcy and listed the lease of the factory as one of his assets. IEE brought suit against Seifert. Manufacture of the on-farm energy plant was delayed pending *666 the resolution of this litigation. Although the outcome of the litigation was favorable, by 1985 the price of fuel had fallen, so that there was less incentive for farmers to invest in the on-farm energy plant. Mr. Tonn and IEE are not currently engaged in manufacturing or selling the on-farm energy plant. For the years 1983-1985, the Advisory Committee of Independent Energy Systems, Inc., which was composed of the principals of that corporation, recommended that the limited partners be allowed not to make their capital contributions. Petitioner made no contribution after 1983. Independent Energy Systems, Inc., did not demand payment or attempt to enforce petitioner's commitment. A portion of the on-farm energy plant was demonstrated at Farmfest, an agricultural exposition held in Lake Crystal, Minnesota, in August 1982. The equipment was constructed of new components purchased by Mr. Tonn or Laurington Corporation and modified by Tonn, Gary Caldwell and his brothers, the DeWitt family, and others including an instructor at a local vocational-technical school. The alcohol-producing unit and the farm utilities unit were completed just prior to Farmfest. The gasification equipment *667 was not completed and was not shown. At Farmfest, the equipment was hooked up and run to generate alcohol and electricity for test purposes. The equipment was displayed, but not actually demonstrated, at the show due to considerations of noise and safety. No electricity produced by the equipment was sold at Farmfest. A tractor owned by Gary Caldwell was used, however, by the Kato Light Corp to generate electricity. IES - (I) received its share of this equipment on September 1, 1982. The IES - (I) equipment was stored at the Caldwell farm in Truman, Minnesota, next to the alcohol plant owned by Laurington Energy Properties, and there it was shown to potential buyers and investors. After Farmfest, the equipment rested until after harvest was completed in late October 1982. It was then hooked up and demonstrated to neighbors, potential investors, and anyone who was interested. The equipment was not used to generate electricity for the Caldwell farm or any other farm. The Caldwell farm paid no rent on the equipment. The smaller components belonging to IES (I), such as the electric generators, heat recovery equipment, and mash separating equipment were moved to the Kiel, Wisconsin, *668 manufacturing facility for further testing in preparation for manufacturing. The components belonging to IES - (I) were eventually returned to the Caldwell farm or the Tonn farm. The manufacturing facility has never begun production. The Partnership is now "dormant," and the exact location of all its equipment is uncertain, as it is not currently being used. To date, only one on-farm energy plant has been sold to a sheltered workshop; $ 25,000 of its $ 100,000 purchase price has been paid. IES - (I) was not paid its royalty on this sale, and financial records were not kept for 1982. For 1982, petitioners claimed a full year's cost recovery on the IES - (I) property and an energy investment credit of $ 1,980. In 1983, petitioners filed an Application for Tentative Refund, Form 1045, to carry back the unused energy investment credit claimed on their 1982 Federal income tax return. Tentative refunds were made to them for the taxable years 1979 and 1980 in the amounts of $ 2,403 and $ 917. Respondent determined that the on-farm energy plant was not property eligible for the energy credit because it did not satisfy the requirements of either section 48(1)(2)(B)(i) or (ii): it *669 was neither constructed, reconstructed, or erected by IES - (I), as required by section 48(1)(2)(B)(i), nor did its "original use" commence with IES - (I), as required by section 48(1)(2)(B)(ii). In the alternative, respondent argues that the property was not "placed in service" in 1982 within the meaning of section 1.46-3(d), Income Tax Regs. In view of the fact that we base our decision on our finding that the equipment was not placed in service in 1982, we do not address the question of whether the property was "used" at Farmfest. Investment credit -- of which the energy credit is one component -- and depreciation are allowable in the year in which the qualifying property is "placed in service" by the taxpayer. Secs. 38(a), 46(a)(1), 46(a)(2), 46(c)(1); secs. 1.46-3(a)(1), 1.167(a)-10(b), 1.167(a)-11(e)(1)(i), Income Tax Regs. For purposes of the investment credit, according to section 1.46-3(d)(1), Income Tax Regs., in relevant part, property is "placed in service" in the taxable year in which the property is "placed in a condition or state of readiness and availability for a specifically assigned function." Section 1.167(a)-11(e)(1)(i), Income Tax Regs., which deals with *670 depreciation, provides that: "Property is first placed in service when first placed in a condition or state of readiness and availability for a specifically assigned function," and further provides that the provisions of section 1.46-3(d)(1)(ii), cited above, and (d)(2), Income Tax Regs., relating to investment credit, shall apply for the purpose of determining the date on which property is placed in service. Hence the term "placed in service" has the same meaning for purposes of investment credit and depreciation, under the circumstances of this case. Investment credit and depreciation are allowable only when the taxpayer is engaged in an active trade or business. Piggly Wiggly Southern, Inc. v. Commissioner, 84 T.C. 739, 744-746 (1985), affd. 803 F.2d 1572 (11th Cir. 1986); Lewis v. Commissioner, T.C. Memo 1989-78, affd. without published opinion 928 F.2d 404 (6th Cir. 1991). Expenses, in order to be deductible, must be incurred in carrying on a trade or business: even though a taxpayer has made a firm decision to enter into business and over a considerable period of time spent money in preparation *671 for entering that business, he still has not "engaged in carrying on any trade or business" * * * until such time as the business has begun to function as a going concern and performed those activities for which it was organized. [Fn. ref. omitted.]
Richmond Television Corp. v. United States, 345 F.2d 901, 907 (4th Cir. 1965), vacated per curiam on other grounds 382 U.S. 68 (1965). Thus taxpayers who purchased equipment for a restaurant which was fully equipped but not yet open for business had not placed the equipment in service for investment credit and depreciation purposes. Walsh v. Commissioner, T.C. Memo 1988-242, affd. without published opinion 884 F.2d 1393 (6th Cir. 1989). Taxpayers who purchased equipment for new stores as well as existing, remodeled stores had placed the equipment in service in the remodeled stores, which were already going concerns, but not in those which were as yet unopened. Piggly Wiggly Southern, Inc. v. Commissioner, supra.
As any appeal in this case would lie to the Eighth Circuit, we are constrained to follow the precedent established in *672 that Court. Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940, 30 L. Ed. 2d 254, 92 S. Ct. 284 (1971). The Eighth Circuit has recently held that "property is in a 'state of readiness and availability for a specifically assigned function' only if it is productive on a fairly consistent basis." United States v. Tierney, 947 F.2d 854, 68 A.F.T.R.2d (RIA) 5742 at 5751, 91-2 U.S. Tax Cas. (CCH) P50,509 at 89,936 (8th Cir. 1991). The view of the Eighth Circuit is further set forth in Simonson v. United States, 752 F.2d 341 (8th Cir. 1985), holding that no depreciation was allowable on a truck and trailer intended for use in a grain-hauling business when no business was ever undertaken. "Unused property purchased for a non-existent future commercial enterprise is not 'used for trade or business'," 752 F.2d at 342 (citing Richmond Television Corp. v. United States). Property held for lease to others is placed in service when it is first held out for lease. Cooper v. Commissioner, 88 T.C. 84 (1987); Waddell v. Commissioner, 86 T.C. 848, 898 (1986), *673 affd. 841 F.2d 264 (9th Cir. 1988). In Waddell, we held that taxpayers who executed distribution agreements simultaneously with purchase agreements for medical equipment were entitled to depreciation and investment tax credits in the year the equipment was purchased and immediately held out for lease. The IES - (I) prospectus and limited partnership agreement both state that IES - (I) was formed for the purpose of leasing and selling its components of the on-farm energy plant. As manufacture of this invention was never undertaken, the business operations of IES - (I) never progressed to a point where its equipment could be placed in service. Its activities, therefore, had not "advanced to the extent necessary to establish the nature of its business operations." Aboussie v. United States, 779 F.2d 424, 430 (8th Cir. 1985). In McManus v. Commissioner, T.C. Memo 1987-457, affd. without published opinion 865 F.2d 255 (4th Cir. 1988), we held that a venture whose purpose was to lease a new invention was not engaged in a trade or business for purposes of depreciation and investment credit when the invention *674 was not manufactured and nothing was done to market it. No leasing contracts were ever signed. Hence depreciation and investment tax credit were not allowable in that year. It is unclear from the record whether IEC - (I) ever contemplated leasing the prototype equipment if a lessor had been found or whether leasing activity was to have begun only after manufacturing was under way. In any case, no leasing activity was undertaken by IEC - (I). Testimony at trial made it clear that, after Farmfest, the equipment was not leased or held out for leasing in any systematic way. It was demonstrated casually to neighbors, potential investors, and other interested parties, and some of its components were shipped to the manufacturing facility in Wisconsin for use as a prototype. All manufacturing plans were discontinued, as economically infeasible, due to the decline in the price of oil and gasoline after 1982. We hold that IEC - (I) was not entitled to claim an energy credit for the year 1982, as its equipment was not "placed in service" in that year. It follows, since the "placed in service" requirement is the same for purposes of energy credit and depreciation, that IES - (I) is not *675 entitled to claim any depreciation for 1982 on the on-farm energy plant. To reflect the foregoing, and because of the reservation by the parties of additional issues, An appropriate order will be issued. Footnotes
1. All subsequent section references are to the Internal Revenue Code of 1954 as in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩