T.C. Memo. 2019-108

UNITED STATES TAX COURT

DENISE CELESTE MCMILLAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16203-13.                      Filed August 26, 2019.

Denise Celeste McMillan, pro se.

<u>Michael K. Park</u>, <u>Laura J. Mullin</u>, <u>Priscilla A. Parrett</u>, and <u>Vanessa M. Hoppe</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  This is Denise McMillan's sixth Tax Court case in which the Commissioner challenges deductions she claimed for a horse business.  Her last horse died in 2008, and she has not replaced him.  But being horseless hasn't

[*2] stopped her from claiming deductions for a horse business.  On her 2010

return she reported that she had two businesses:  one for "horse

breeding/showing," which produced only expenses; and one that sold "IT and

database management services," which produced income.  The Commissioner

disallowed all the deductions that she claimed for the horse business, and

disallowed deductions for legal fees and a home office for her IT business as well.

He also argues that Ms. McMillan should've reported a $70,000 settlement from

her homeowners association (HOA) as taxable income.  She says the settlement

was for pain and suffering and that her horse activity really was a trade or

business.

FINDINGS OF FACT

I.    Background

Ms. McMillan is self-employed.  She describes herself as "an administrator,

a corporate officer and director, a[] software programmer, a professionally

schooled equestrian, and an international level dressage competitor and trainer."

She conducts these activities from the living room of her one-bedroom apartment.

A.    Horse Breeding/Showing

Ms. McMillan has been involved with horses since the 1970s.  Her

experience is primarily in dressage, a type of equestrian competition where a rider

[*3] in a top hat and tail coat guides a horse through a series of precise movements. Ms. McMillan aptly compares it to "skilled gymnastics." During the 1980s and 1990s she owned several horses and participated in dressage competitions. She gradually sold off her horses, and by 1997 she had only one left--Goldrush.

Between 1992 and 1997 she bred Goldrush five times, each time charging a $1,500 stud fee. In 2000 Goldrush developed an uneven step and had to stop competing. Ms. McMillan tried to rehabilitate him, but without success. She continued to try to breed him, also without success.

In 2007 Ms. McMillan sent Goldrush to Australia, where she thought she'd have better luck. Although she hadn't received a stud fee for Goldrush since 1997, she hoped that in Australia she could breed him twice a month and get a $1,500 stud fee each time. She used lines of credit to pay for his transportation, and she told the people boarding him they could breed their mares to him in exchange for his upkeep. But in January 2008, only a few months after arriving in Australia, Goldrush died.

By the end of 2010--the tax year at issue in this case--Ms. McMillan still had not bought another horse. She says, however, that this doesn't mean she is out of the horse business. According to her, her "business model * * * is to find a

**[*4]** talented horse with potential for the right price, train the horse to international level, and then sell the horse at a profit." To find a horse, she says she "let it be known by word of mouth that [she] was in the market for a suitable international level dressage horse prospect," and occasionally people would tell her about available horses. As part of her search she "visited private training barns, networked with business contacts, [and] reviewed video tapes of horses for sale." In 2010 she also attended--but did not participate in--five dressage competitions.

She also went regularly to a local "barn", her term for a "professional dressage training facility." At the barn she rode an acquaintance's horse and gave some free riding lessons. She also "lunged" about a dozen horses, which is a form of pretraining where the horse runs around the trainer in a circle while attached to a long rope. Although lunging usually lasts only 45 minutes, Ms. McMillan said she also prepared the horses for their exercise, cooled them down afterward, and washed them. All this could take up to 3 hours total--meaning that she spent about 36 hours performing these tasks in 2010. Her testimony on the compensation she earned for this was inconsistent: She testified first that her rate for this work was $30 an hour, but then said she received only permission to store her horse tack and dressage clothes at the barn. Whether this was cash or barter income, she did not report it.

[*5]   Although Ms. McMillan's involvement with horses spans five decades, she's had only three profitable years--none after 1988.  To her, however, 1997 was the turning point.  In that year she testified against a former business partner in an animal-cruelty case and tried to stop him from keeping a horse she'd sold.  She says that as a result of that testimony she "lost all of her business within the dressage community."

The losses she's reported from her horse activity are quite large.  Here are her reported income and expenses for 2004-10:

| Year | Gross income from horse activity | Expenses from horse activity | Net profit or (loss) from horse activity |
|---|---|---|---|
| 2004 | $588 | $36,453 | ($35,865) |
| 2005 | -0- | 22,277 | (22,277) |
| 2006 | -0- | 33,128 | (33,128) |
| 2007 | -0- | 51,697 | (51,697) |
| 2008 | -0- | 4,203 | (4,203) |
| 2009 | -0- | 7,486 | (7,486) |
| 2010 | -0- | 5,238 | (5,238) |
| Total | 588 | 160,482 | (159,894) |

**[*6]** B.     IT and Database Management Services

Fortunately for Ms. McMillan, "horse breeding/showing" is not her only source of income.  Starting in 2000 she did database software programming for a direct marketer called Tony Hoffman Productions.  She first worked in that company's office, but in 2003 she convinced her boss to let her work from home.  In 2008 she started doing similar work for a company called Q.X. Telecom, also working from home.  In 2010 she worked 5-6 hours a day for Q.X. Telecom, but her schedule was irregular and those hours were spread throughout the day.  In 2010 Q.X. Telecom paid her $65,000 and reported it on a Form 1099-MISC, Miscellaneous Income.  The record shows that she's earned around $60,000 a year from her IT work since at least 2004.

C.     Home Office

Ms. McMillan had seven computers, all of which she kept along a single wall of her roughly 800-square-foot, one-bedroom apartment's living room.  She used one computer for her IT job, one for her horse-related activity, one to administer her website, one to watch horse DVDs, two as backups, and one as a file server.

Although the living room took up about half of her apartment, Ms. McMillan said she never used it for anything but work.  In addition to her IT

[*7] work, she says she "conducted every aspect of [her] dressage horse business from that office, except grooming, saddling, and riding." She testified that in all of 2010 she never entertained at home. She also claims that she ate all of her meals in her kitchen's dining area, kept her television and stereo in her bedroom, and kept most of her books in a walk-in closet.

D.    Lawsuits

But Ms. McMillan also worked on something else in her living room--lawsuits. She's been involved in several, including some small-claims cases and a suit against movers she used in 2011. One of these cases began in 2005 when she filed a complaint against her HOA for breach of covenants, breach of fiduciary duty, and nuisance. She said the HOA had ignored her "frequent complaints of off-leash dogs barking, fighting, biting and defecating throughout the Association's common areas;" "the presence of mold in her bathroom, growing between the tiles themselves and between the wall and the tub rim;" and "severe noise intrusion stemming from alleged improper structural construction and/or repairs thereof." The Case Information Sheet she filed at the start of the case had a space for her to "[l]ist all general and specific damages claimed, including but not limited to, medical expense (past and future), loss of earnings, property damages,

[*8] and any other specific monetary damages that apply in your particular case," but she left it blank.

She went through several attorneys and even sued her first attorneys for malpractice after they--in her words--"attempt[ed] to settle [her] lawsuit without [her] permission." Those attorneys ended up filing a lien in an attempt to collect unpaid fees. And while that case was ongoing, the Ventura County District Attorney's Office prosecuted her for misdemeanor violations of California's peeping-tom statute. According to a letter from one of her attorneys, the charges arose from her attempt "to gather sound samples from the unit above her at a time when the unit was unoccupied and was being remodeled by numerous workmen."

The HOA settled in June 2010 for $70,000. Much of it went to pay Ms. McMillan's new attorney and satisfy the old attorneys' lien. The named defendant was Shadow Ridge at Oak Park Homeowners Association, and in the settlement Ms. McMillan agreed to take down a website she had made called "www.bewareofshadowridge.com" that used the names of the HOA's president and board members.

The settlement documents describe the case as a dispute over "alleged nuisances, claims of emotional distress, libel, slander, invasion of privacy and construction defect." At trial, however, Ms. McMillan claimed that either the

**[\*9]** mold or the stress had made her nauseous, that she'd developed a rash, and that in 2006 she spent around $19,000 to stay in a hotel rather than remain in her apartment. In 2004 she'd seen a psychiatrist, whose name she remembered at trial, but she couldn't remember the name of a general practitioner who she says prescribed rash cream for her around the same time. Neither could she remember the name of a doctor she said her attorneys planned to call as an expert witness, though she did remember the names of her mold, construction-defect, and noise experts.

Ms. McMillan's litigation experience also includes five previous cases in the Tax Court. She and the Commissioner settled three of those cases, but the other two went to trial with one going to appeal and then to the Supreme Court. See McMillan v. Commissioner (McMillan II), T.C. Memo. 2015-109 (finding no trade or business in horse activity in which petitioner's one horse had died); McMillan v. Commissioner (McMillan I), T.C. Memo. 2013-40 (finding no trade or business in horse activity in which petitioner's one horse had neither been bred nor competed in eight years), aff'd, 697 F. App'x 489 (9th Cir. 2017), cert. denied, 138 S. Ct. 1010 (2018).

[*10] II.    2010 Tax Return

Ms. McMillan prepared her 2010 tax return herself.  She didn't report the $70,000 from her settlement of the HOA suit.  At trial she characterized it as an award for pain and suffering and said that she'd learned in 1998 that such awards aren't taxable after she had settled a different lawsuit.  She also said that a CPA she'd used in the 1990s told her that the exclusion is now more "narrowly defined" and is appropriate only when someone is "physically ill."  She did not ask any of her attorneys about it.

She included two Schedules C with her return:  one for "horse breeding/showing" and one for "IT and database management services."  On her Schedule C for "horse breeding/showing," she reported zero income and the following expenses, for a total loss of $5,238:

| Expense | Amount |
| --- | --- |
| Car and truck | $250 |
| Interest (other) | 3,938 |
| Rent (other business property) | 960 |
| Other | 90 |
| Total loss | 5,238 |

[*11] The "car and truck expenses" are for 500 miles driven. The "other expenses" are for "magazines and subscriptions." Ms. McMillan didn't explain on her return or at trial what the "interest" was for.[1] We don't know what the "other business property" was.

On her Schedule C for the IT and database management business Ms. McMillan also claimed deductions for home-office expenses. These totaled $8,045 and consisted of $2,246 in depreciation plus half of the following expenses:

| Expense | Amount |
|---|---|
| Insurance | $2,305 |
| Utilities | 5,392 |
| Other expenses | 3,900 |

---

[1] During the trial arising from her 2009 tax year, she argued that the $5,690 in interest she deducted on her horse-related Schedule C for that year was for money she borrowed in 2007 to send Goldrush to Australia. The transcript of that trial is in the record here--Ms. McMillan proffered it; and although the Commissioner initially objected to it, he later withdrew his objection. The record is silent, however, regarding the origin of the $3,938 interest expense on Ms. McMillan's 2010 "horse breeding/showing" Schedule C. We will not just assume that it also was related to moving Goldrush to Australia; in any event, Ms. McMillan introduced no evidence at all that she actually paid that amount in interest in 2010.

[*12] The record doesn't tell us what the "other expenses" were or whether they were actually paid. Ms. McMillan deducted half these expenses because she claimed she used half her apartment as a home office.

She also deducted $11,998 for legal and professional services, which included amounts she paid to both the attorney representing her in her suit against her HOA and the attorney who defended her against the misdemeanor charges.

III. Petition and Trial

The Commissioner issued Ms. McMillan a notice of deficiency that disallowed deductions for legal and professional services, and for business use of her home--deductions she'd taken on her Schedule C for her "IT and database management services." The notice also asserted a section 6662(a)[2] penalty on the alternate grounds of negligence or disregard of rules or regulations, a substantial understatement of income tax, and a substantial-valuation misstatement. Ms. McMillan timely filed a petition, and in his answer the Commissioner raised two new issues--that Ms. McMillan was not entitled to any deductions for her horseless "horse breeding/showing" business and that the $70,000 she'd received in the HOA settlement was taxable. He also asserted an increased section 6662(a)

---

[2] All section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we say otherwise.

**[*13]** penalty on these deficiencies, although only on the grounds of negligence or disregard of rules or regulations.

We tried the case in Los Angeles.[3]  At trial the Commissioner didn't introduce any evidence that he'd complied with section 6751(b)(1), even though he'd asserted penalties.  See Graev v. Commissioner, 149 T.C. 485, 493 n.14 (2017) (citing Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42), supplementing and overruling in part 147 T.C. 460 (2016)).  After trial progress slowed considerably when Ms. McMillan moved to make 95 corrections to the transcript.  Some of her proposed corrections were for missing testimony; others were for mistakes such as misspelling "libel" as "liable" and "mane" as "main"; and still others were for misspelling proper names.  Her list of proposed corrections contained commentary, such as when she wrote "should be **'breeding,'** not 'breading' -- was Spellcheck broken?"  The Commissioner didn't object to Ms. McMillan's motion, and the Court adopted

---

[3] The Commissioner lodged objections to several statements in the stipulation of facts and the first supplemental stipulation of facts, as well as to many exhibits attached to those stipulations.  At trial we explained that the party who wanted an exhibit admitted over an objection was responsible for introducing it during testimony, at which point we would rule on any objection that was renewed.  Most such exhibits were not addressed at trial.  The exhibits that were admitted in their entirety are 1-J, 4-J, 5-J, 6-J, 16-J through 21-J, 26-J, 28-J through 30-J, 43-J, 46-J through 48-J, 50-J through 56-J, 58-J, and 60-J.  We also admitted pages 3483-3485 of exhibit 68-P.

**[*14]** many of Ms. McMillan's proposed corrections and ordered that a corrected transcript be filed.

Ms. McMillan lived in California at all relevant times, so absent a stipulation to the contrary this case is appealable to the Ninth Circuit. See sec. 7482(b)(1)(A).

OPINION

There are five questions for us to answer:

- Should Ms. McMillan have reported the HOA settlement proceeds as income?

- Can Ms. McMillan deduct the expenses she listed on her Schedule C for "horse breeding/showing"?

- Can Ms. McMillan deduct half the cost of her apartment as a home-office expense?

- Can Ms. McMillan deduct on her Schedule C for "IT and database management services" the attorney's fees she paid to prosecute her HOA suit and defend against the criminal case?

- Is Ms. McMillan liable for a section 6662(a) penalty?

We begin with some general points. The first is the burden of proof. Taxpayers usually bear that burden in our Court. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The Commissioner bears the burden only for new matters, increases in deficiencies, or affirmative defenses that he raises in

**[\*15]** his answer. Rule 142(a). It's therefore up to Ms. McMillan to show that she's entitled to the legal-fee and home-office deductions that the Commissioner disallowed in the notice. But it's up to the Commissioner to show that Ms. McMillan can't exclude her settlement proceeds or deduct her horse-related expenses, because he raised those issues for the first time in his answer.

We also note that the outcomes of Ms. McMillan's prior audits and Tax Court cases don't affect this case. Each tax year stands on its own, and the Commissioner doesn't have to allow deductions now just because he didn't disallow similar deductions in the past. See, e.g., Pekar v. Commissioner, 113 T.C. 158, 166 (1999).[4] This makes sense because facts that determine whether a deduction is proper can change from year to year. For example, a taxpayer might use a home office exclusively for business in year 1, which would make a deduction proper, but might use the same office for both business and nonbusiness purposes in year 2, which would mean no deduction. See sec. 280A(a), (c)(1). Treating each tax year separately also prevents deductions that were mistakenly allowed from becoming perennial windfalls to undeserving taxpayers. See Pekar, 113 T.C. at 166.

---

[4] Neither party has argued that collateral estoppel applies to any issue in this case.

[*16] In her amended petition Ms. McMillan said that the deductibility of her legal fees was "judicially estopped" by her settlement with the IRS for her 2004 tax year. But that stipulated decision wasn't a judicial determination--it was just an agreement between the parties. See United States v. Int'l Bldg. Co., 345 U.S. 502, 505 (1953). And the fact that the Commissioner settled doesn't necessarily mean that he believed Ms. McMillan's position was correct; he could've folded as a result of the litigation risks, not the underlying facts. See id. (settlement could be based on merits or collateral considerations). Inconsistent treatment over the years doesn't itself mean something's amiss, and a stipulated decision doesn't bind the Court in a subsequent case about a different tax year. See id. at 505-06; see also Rule 91(e) (stipulation binding in present case only).

Ms. McMillan cites Tait v. W. Md. Ry. Co., 289 U.S. 620, 621-24 (1933), a case which did involve collateral estoppel. In that case the Supreme Court acknowledged that "the scheme of the revenue acts is an imposition of tax for annual periods, and the exaction for one year is distinct from that for any other," but went on to say that this fact shouldn't "deprive the government and the taxpayer of relief from redundant litigation of the identical question of the statute's application to the taxpayer's status." Id. at 624. In that case, the question was whether a corporation could amortize the original issue discount (OID) on

**[\*17]** specific bonds that predecessor corporations had issued in 1902-08 and 1911. Id. at 621-22. In a case involving tax years 1918 and 1919, the Fourth Circuit had said it could, but the Commissioner nevertheless went on to disallow the amortization deduction *for the same exact bonds* for tax years 1920-25. Id. at 622. The Supreme Court said that the subsequent cases were estopped because "the facts with respect to the sale of bonds and the successive ownership * * * were the same at the time of both trials." Id. at 625. In other words, nothing about the issuance of the bonds in 1902-08 and 1911 had changed--or could have changed--between the 1918-19 case and the 1920-25 case.

Unlike the question of how to treat a specific debt instrument's OID, whether legal fees paid during a single year are ordinary and necessary business expenses depends on facts and circumstances specific to that year--it doesn't matter whether different fees paid in different years were deductible or not. As with our home-office example above, it is entirely possible that the fees Ms. McMillan paid in one year met the deductibility requirements but that the fees she paid in another did not--as we discuss below, it depends on what exactly those fees were for. So, W. Md. Ry. Co. doesn't help Ms. McMillan. It also doesn't hurt her--for the same reasons, our opinions disallowing deductions for fees she paid in

**[\*18]** 2007 and 2008, <u>McMillan I</u>, at \*25, and allowing just 50% of the deduction she claimed for 2009, <u>McMillan II</u>, at \*11, are also irrelevant.

It's not surprising that neither party asked us to rely on our opinions in Ms. McMillan's other two cases because each of those reached a different result--possibly because the parties' burdens were different in each.[5]  <u>Compare</u> <u>McMillan I</u>, at \*8-\*9, <u>with</u> <u>McMillan II</u>, at \*3.  In the case involving her 2007 and 2008 tax years Ms. McMillan had the burden of proof on all issues; and in addition to finding that legal fees related to her HOA suit weren't deductible, we held that her horse activity was not a trade or business and that interest on the loan she took out to send Goldrush to Australia wasn't deductible.[6]  <u>McMillan I</u>, at \*8-\*9, \*22, \*25.  The Commissioner had the burden of proof on every issue in the case involving her 2009 tax year, and he failed to challenge the assertion she made on her return that her apartment was 50% office, so we allowed her to deduct 50% of her legal fees from the HOA suit.  <u>McMillan II</u>, at \*3, \*11.  There we also allowed Ms. McMillan to deduct interest expenses related to Goldrush's

---

[5] Ms. McMillan specifically said she wasn't raising collateral estoppel or *res judicata*, though she did argue that her prior returns and the Commissioner's treatment of them were relevant.

[6] In that opinion we also held that Goldrush's death did not constitute a casualty loss.  <u>See</u> <u>McMillan I</u>, at \*23-\*25.

**[\*19]** transportation because the Commissioner didn't show that her horse activity wasn't a trade or business in 2007 when she took out the loan. Id. at \*26-\*28. But we still found that her horse activity wasn't a trade or business in 2009--though Ms. McMillan was the Commissioner's only witness. Id. at \*25. Even if we had a reason to follow these cases, we couldn't rely on the inconsistent results.

Ms. McMillan also complains that she gets audited a lot, she doesn't like how the audits are done, and the Commissioner sometimes allows and sometimes doesn't allow her home-office, attorney's-fees, and horse-business deductions. But, as we've explained, it makes sense for different years to come out differently because the facts and circumstances that determine whether these types of deductions are appropriate are specific to individual tax years. Unless there's "substantial evidence of unconstitutional conduct" by the Commissioner--and we find none in the record here--we don't look behind notices of deficiency. See Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327-28 (1974); but see Graev v. Commissioner, 149 T.C. at 514 (Holmes, J., concurring). That's because Tax Court proceedings are *de novo* reviews of the taxpayer's tax liability. Greenberg's Express, Inc., 62 T.C. at 328. For example, we didn't look behind the notice of deficiency in Greenberg's Express, Inc., where the taxpayers complained

[*20] that they were subjected to multiple audits only because of their affiliation with the Gambino crime family. We won't look behind it here, either.

This case stands on its own.

## I. Settlement Proceeds

We'll start with the one income issue in the case. The Commissioner says Ms. McMillan should've reported as income the $70,000 settlement of her HOA suit--after all, gross income is all income "from whatever source derived." Sec. 61(a); see also Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 429-31 (1955). Ms. McMillan makes two arguments for why she didn't have to: She first argues that the $70,000 was an award for pain and suffering, even though the settlement documents don't say so; and second, she didn't actually receive all of the settlement money because some went to pay her current attorney and satisfy her prior attorneys' lien. We look at each.

### A. Pain and Suffering

Section 104(a)(2) excludes from gross income damages received "by suit or agreement * * * on account of personal physical injuries or physical sickness." To qualify for this exclusion, a taxpayer must show that "the damages were received on 'account of personal injuries or sickness.'" Commissioner v. Schleier, 515 U.S.

**[*21]** 323, 337 (1995) (quoting section 104);[7] see also Green v. Commissioner, T.C. Memo. 2007-39, 2007 WL 518908, at *3, aff'd in part, remanded on other grounds, 312 F. App'x 929 (9th Cir. 2009); Allum v. Commissioner, T.C. Memo. 2005-177, 2005 WL 1692488, at *4, aff'd, 231 F. App'x 550 (9th Cir. 2007). But "emotional distress shall not be treated as a physical injury or physical sickness," sec. 104(a) (flush language), nor shall things like insomnia, headaches, or stomach problems that result from such distress, see Pettit v. Commissioner, T.C. Memo. 2008-87, 2008 WL 928090, at *4; see also H.R. Conf. Rept. No. 104-737, at 301 n.56 (1996), 1996-3 C.B. 741, 1041.

To decide whether settlement proceeds qualify for this exclusion, "we look to the written terms of the settlement." Pettit, 2008 WL 928090, at *3; see also Allum, 2005 WL 1692488, at *4. In Pettit, 2008 WL 928090, at *1, *4, for example, we found that an award for age discrimination was includable--even though the taxpayer told us he'd suffered from irritable bowel syndrome and headaches--because the settlement agreement neither "contain[ed] language

---

[7] In Schleier, 515 U.S. at 337, the Supreme Court also said the underlying cause of action must be "based upon tort or tort type rights," but the Commissioner has since removed that phrase from his regulations. See Perez v. Commissioner, 144 T.C. 51, 59-62 (2015).

**[*22]** indicating * * * evidence of physical injuries or physical sickness" nor made any "allusion to compensation for a physical injury or physical sickness."

The settlement document here says the $70,000 was consideration for Ms. McMillan's dismissing her suit, which it describes as being "in connection with the construction, maintenance, upkeep, enforcement of CC&Rs, and conditions [of Ms. McMillan's residence], including alleged nuisances, claims of emotional distress, libel, slander, invasion of privacy and construction defect." Unlike the settlement in Pettit, it doesn't apportion funds among different types of damages. See id. at *1. But like the Pettit settlement it also doesn't "contain language indicating that [Ms. McMillan] presented any evidence of physical injuries or physical sickness," nor does it make any "allusion to compensation for a physical injury or physical sickness." See id. at *4. The settlement agreement therefore doesn't show that any of the $70,000 was paid "on account of personal physical injuries or physical sickness." See sec. 104(a).

Even if the settlement agreement were ambiguous about what the $70,000 was for, we'd still find that the entire amount was includable. If a settlement document isn't clear, "we look to the intent of the payor, based on all the facts and circumstances of the case, including the complaint that was filed and the details surrounding the litigation." Allum, 2005 WL 1692488, at *4. And general

**[\*23]** allegations of physical injury or physical sickness in a complaint are not enough--they have to be specific. See id. The settlement document here specifies that the HOA paid Ms. McMillan to drop her suit and take down her website--that is, it wasn't compensating her for physical injuries or sickness. And Ms. McMillan's pleadings made clear that she filed the suit because the HOA ignored her complaints about dogs, mold, and noise--not because she was injured or ill. She even left the damages section of the Case Information Sheet blank.

The only evidence in the record of this case that suggests the settlement was for physical injury is Ms. McMillan's own testimony, and even then she said it could've resulted from stress--which would make it a symptom of emotional distress and mean that the settlement proceeds would still be includable in her income. See Pettit, 2008 WL 928090, at \*4. And we don't believe her testimony about these symptoms to begin with--although she could remember the name of her mold expert, construction-defect expert, and noise expert whom she'd planned to call if the HOA suit went to trial, she couldn't remember the name of either the doctor she said she would call or the doctor that she said had treated her.

The evidence we have about the HOA suit shows that no part of the settlement proceeds was paid "on account of personal physical injuries or physical

[*24] sickness." <u>See</u> sec. 104(a)(2). Those proceeds are therefore not excludable under section 104(a)(2).

### B.    <u>Attorney's Fees</u>

This brings us to Ms. McMillan's argument that the $70,000 wasn't income to her because it went to pay her attorneys. The applicable rule here is simple-- when settlement proceeds are income, so is whatever portion of them goes to attorney's fees.[8] <u>Commissioner v. Banks</u>, 543 U.S. 426, 436-37 (2005). That's true even if what the attorney gets is a contingency fee or money awarded by a fee-shifting provision. <u>See</u> <u>Sinyard</u>, 268 F.3d at 759; <u>Green</u>, 2007 WL WL518908, at *3. In <u>Banks</u>, 543 U.S. at 433-34, the Supreme Court pointed out that the alternative--allowing successful plaintiffs to exclude from their income amounts they paid in attorneys' fees--would permit anticipatory assignments of potential income, something courts have long forbidden. The Court also rejected the argument that a plaintiff and his attorney were joint venturers seeking income together, instead finding that they were principal and agent. <u>Id.</u> at 435-36. It explained that because an "attorney is an agent who is dutybound to act only in the

---

[8] But attorneys' fees might be *deductible*. <u>See, e.g.</u>, <u>Banks</u>, 543 U.S. at 433; <u>Sinyard v. Commissioner</u>, 268 F.3d 756, 759 (9th Cir. 2001), <u>aff'g</u> T.C. Memo. 1998-364.

**[\*25]** interests of the principal, \* \* \* it is appropriate to treat the full amount of [a] recovery as income to the principal." Id. at 436.

Because the $70,000 settlement Ms. McMillan received from her HOA was income to her, it doesn't matter if part or all of it went to pay her attorneys--she had to report it all.[9] We therefore find for the Commissioner on this issue.

II.    Horse Breeding/Showing

With income out of the way, we can corral the deduction questions. The first is Ms. McMillan's claimed $5,238 loss on her "horse breeding/showing" Schedule C. On that schedule she reported no income and deducted the following expenses: $250 for mileage, $90 for "magazines and subscriptions," $3,938 in interest, and $960 for renting or leasing "other business property." In his answer the Commissioner said she wasn't entitled to these deductions because her "horse breeding/showing" activity wasn't a trade or business.

Taxpayers can deduct the ordinary and necessary expenses of carrying on a trade or business. Sec. 162(a). Whether an activity is a trade or business depends on the facts and circumstances, but three factors have to be present: The taxpayer

---

[9] We also note that the record doesn't show exactly how much of the settlement went to attorney's fees or to satisfy the lien. Ms. McMillan says in her brief that $17,000 went to the person who was her attorney at the end of the suit, that $35,000 went to satisfy the lien, and that prior years' expenses made the lawsuit a net loss to her; but those facts aren't in evidence.

**[\*26]** must be regularly and actively involved in the activity; the activity must have begun; and the taxpayer must intend to make a profit.  See Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); McManus v. Commissioner, T.C. Memo. 1987-457, 1987 Tax Ct. Memo LEXIS 454, at \*19-\*21, aff'd without published opinion, 865 F.2d 255 (4th Cir. 1988).

A.     Regular and Active

For an activity to be a trade or business, the taxpayer has to regularly and actively be involved with it--"[a] sporadic activity, a hobby, or an amusement diversion does not qualify."  Groetzinger, 480 U.S. at 35; see also, e.g., McManus, 1987 Tax Ct. Memo LEXIS 454, at \*20.  In Groetzinger, 480 U.S. at 24, 36, for example, the Supreme Court held that gambling was the trade or business of a taxpayer who for nearly an entire year went to a greyhound track six times a week and spent 60-80 hours each week on gambling-related activities such as placing bets and studying racing forms.  In Barker v. Commissioner, T.C. Memo. 2012-77, 2012 WL 947134, at \*8, however, we found a taxpayer didn't actively and regularly engage in the development of radio equipment for astronauts in a year when his only related activity was going to two conferences about Mars.

Ms. McMillan's situation in 2010 was closer to Barker than Groetzinger. We do believe that she at least contemplated a business--she credibly testified that

**[\*27]** during that year she "let it be known by word of mouth" that she was in the market for a horse. We also believe that she talked to people about horses and watched videos of horses that were for sale. We even believe that she watched five dressage competitions--but these are the sorts of things someone interested in getting into (or, as with Ms. McMillan, resuming) a business might do. The only thing we can quantify is the 36 hours of lunging she did in exchange for the barter income she didn't report. We can also infer that she didn't engage in her horse-related activity full-time because she also spent 5-6 hours a day working for Q.X. Telecom as well as what must've been significant time on litigation. The Commissioner correctly calls this activity "limited" and points out that Ms. McMillan didn't call any witnesses to corroborate that she actually engaged in it. That argument doesn't help him, though, because he has the burden of showing that Ms. McMillan wasn't entitled to the deductions she'd listed on her "horse breeding/showing" Schedule C--meaning it was up to *him* to present evidence that Ms. McMillan did *not* actively and regularly engage in her horse-related activity, not up to her to show that she *did*.

Ms. McMillan, however, loses because of her testimony. She neither owned a horse nor participated in any dressage competitions in 2010, and this leads us to

[*28] find it more likely than not that she was not actively and regularly involved in "horse breeding/showing" that year.

B.      Actual Commencement

To be a trade or business, an activity must also have actually commenced-- which means it has to have "begun to function as a going concern and performed those activities for which it was organized." Richmond Television Corp. v. United States, 345 F.2d 901, 907 (4th Cir. 1965), vacated and remanded on other grounds, 382 U.S. 68 (1965); accord Heinbockel v. Commissioner, T.C. Memo. 2013-125, at *42-*44; McManus, 1987 Tax Ct. Memo LEXIS 454, at *21.  Deciding to start a business and spending money on it--even over a considerable length of time-- isn't enough.  McManus, 1987 Tax Ct. Memo LEXIS 454, at *21.  That's because an active trade or business is "more than initial research into or investigation of business potential."  Heinbockel, at *42; see also Dean v. Commissioner, 56 T.C. 895, 902-03 (1971) (cost of traveling to view and potentially purchase equipment for future business not deductible under section 162 or section 212).  The cost of driving around looking for newspapers or radio stations to buy, for example, isn't deductible.  Frank v. Commissioner, 20 T.C. 511, 513 (1953).

An activity doesn't have to be generating revenue yet to be actively and regularly engaged in, see, e.g., Barker, 2012 WL 947134, at *8, but it does have to

**[\*29]** be up and running.  That's why in <u>Heinbockel</u>, at \*44, we found that a

taxpayer who said he was running a vineyard but hadn't yet planted any grape

vines wasn't entitled to section 162 deductions.  In <u>McKelvey v. Commissioner</u>,

T.C. Memo. 2002-63, 2002 WL 341044, at \*3-\*4, <u>aff'd</u>, 76 F. App'x 806 (9th Cir.

2003), we disallowed deductions by a taxpayer who bought land for a tree farm

but didn't yet farm any trees.  Buying land and planning to develop it isn't enough

to make an activity a trade or business, <u>see</u> <u>Christian v. Commissioner</u>, T.C.

Memo. 1995-12, 1995 WL 9151, at \*4-\*5, and neither is issuing stock, signing

contracts, and buying components if actual manufacturing hasn't yet begun, <u>see</u>

<u>McManus</u>, 1987 Tax Ct. Memo LEXIS 454, at \*24-\*26.[10]

That Ms. McMillan didn't own, breed, or show any horses in 2010 makes it

impossible for Ms. McMillan to do what a "horse breeding/showing" business

does--breeding and showing horses.  The things Ms. McMillan says she did--

talking about, watching, and thinking about horses and occasionally training other

people's horses--are at best initial research into a potential "horse

breeding/showing" business.  <u>See</u> <u>Dean</u>, 56 T.C. at 902-03; <u>Frank</u>, 20 T.C. at 513.

_____

[10] The costs of many of these activities may, however, qualify as "startup" or "pre-opening" expenses, which become deductible over time only after the active trade or business commences.  <u>Heinbockel</u>, T.C. Memo. 2013-125, at \*43 (citing <u>Hardy v. Commissioner</u>, 93 T.C. 684, 687 (1989), and section 195).

**[\*30]** Without a horse, Ms. McMillan was like the vineless vintner in <u>Heinbockel</u>, at \*44; the treeless tree farmer in <u>McKelvey</u>, 2002 WL 341044, at \*3-\*4; the developmentless developer in <u>Christian</u>, 1995 WL 9151, at \*4-\*5; and the manufacturer who didn't do any manufacturing in <u>McManus</u>, 1987 Tax Ct. Memo LEXIS 454, at \*24-\*26--she may have been getting ready to start or resume a business, but that business hadn't begun.

We believe Ms. McMillan when she says that she's been continuously involved with horses since the 1970s. But her last horse died in 2008, at which point she hadn't shown or bred him in a decade. We therefore find that if her horse activity was ever a trade or business, that trade or business ended before 2010, and in that year she was at most looking into starting anew. Ms. McMillan's "horse breeding/showing" business hadn't actually commenced or resumed by the end of 2010.

## C.  Profit Motive

The third alternative ground for disallowance here is that an activity is a trade or business that qualifies for section 162 deductions only if the taxpayer's "predominant, primary or principal objective" for engaging in it is to make an economic profit independent of tax savings. See <u>Wolf v. Commissioner</u>, 4 F.3d 709, 713 (9th Cir. 1993), <u>aff'g</u> T.C. Memo. 1991-212; <u>see also</u> sec. 183(a), (c);

**[\*31]** Groetzinger, 480 U.S. at 35; Drobny v. Commissioner, 86 T.C. 1326, 1340-41 (1986). A profit motive is also required for section 212 deductions, which are for expenses incurred in the production of income when there isn't a trade or business. See Bolaris v. Commissioner, 776 F.2d 1428, 1432 (9th Cir. 1985), aff'g in part, rev'g in part 81 T.C. 840 (1983); Allen v. Commissioner, 72 T.C. 28, 33 (1982); see also sec. 183(a), (c). A taxpayer's profit expectation doesn't have to be reasonable, but it must be genuine. See Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without published opinion, 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs.

The regulations tell us to consider "objective standards, taking into account all of the facts and circumstances" when determining whether a taxpayer intended to make a profit. Sec. 1.183-2(a), Income Tax Regs. They also list nine factors for us to consider, although "[n]o one factor is determinative," we can consider additional factors, and we're not supposed to simply compare the number of factors that suggest a profit motive to the number of factors that don't. See sec. 1.183-2(b), Income Tax Regs. The Seventh Circuit says this is "a goofy regulation" and thinks we should take a more holistic approach to the question of whether a taxpayer intended to turn a profit. Roberts v. Commissioner, 820 F.3d 247, 250, 254 (7th Cir. 2016), rev'g T.C. Memo. 2014-74. It did so itself in an

**[*32]** opinion that dealt with horse breeding.  See Estate of Stuller v. United

States, 811 F.3d 890, 896-98 (7th Cir. 2016).  This case is appealable to the Ninth

Circuit, though, so we'll consider all nine factors.

### 1. Manner in Which the Activity Is Conducted

The first factor tells us to look at how the taxpayer conducts the activity.  It

says "[t]he fact that the taxpayer carries on the activity in a businesslike manner

* * * may indicate that the activity is engaged in for profit."  Sec. 1.183-2(b)(1),

Income Tax Regs.  Maintaining "complete and accurate books and records,"

having a business plan, carrying on an activity "in a manner substantially similar

to other activities of the same nature which are profitable," and changing

"operating methods, adopt[ing] * * * new techniques or abandon[ing] * * *

unprofitable methods in a manner consistent with an intent to improve

profitability" show that a taxpayer conducted an activity in a businesslike manner.

See id.

### a. Books and Records

Complete and accurate books and records can suggest that an activity is

conducted in a businesslike manner.  See id.  It's not the act of keeping records

that makes this true, but instead the records' helpfulness to a taxpayer in

evaluating an activity's performance, cutting expenses, and increasing profits.  See

[*33] Golanty v. Commissioner, 72 T.C. 411, 430 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981). Ms. McMillan testified that she kept records using Microsoft Money, but that movers she used in 2011 lost them and the hard drive where she kept electronic copies was accidentally erased. The Commissioner suggests we disbelieve this testimony, especially because Ms. McMillan was able to turn over some very old tax returns. But even if we assume that Ms. McMillan did keep these records, they apparently didn't enable her to avoid large sustained losses since at least 2004, and any profit since 1988. In light of this decades-long lack of improvement, we find that the mere act of recordkeeping doesn't suggest that Ms. McMillan conducted her horse activity in a businesslike manner.

b. Business Plans

A business plan also suggests that an activity is conducted in a businesslike manner. See Phillips v. Commissioner, T.C. Memo. 1997-128, 1997 WL 105015, at *6; sec. 1.183-2(b)(1), Income Tax Regs. Business plans don't have to be in writing--we also consider unwritten plans evidenced by taxpayers' actions. See Phillips, 1997 WL 105015, at *6 (plan shown by building barn and tack shop and breeding and registering horses). Ms. McMillan testified that her business plan was to "find a talented horse with potential for the right price, train the horse to

[*34] international level, and then sell the horse at a profit." At trial she testified about amounts she'd bought and sold horses for in the 1980s and early 1990s, but the plan she described for 2010 lacked some important details--a budget for buying and boarding a horse, a timeline for its training and sale, and an estimate of expected return on investment. Her actions in 2010 give no substance to her vague testimony--in that year, the only steps she took toward purchasing, training, or selling a horse were sporadic, word-of-mouth inquiries about available horses. This lack of a coherent business plan also suggests an unbusinesslike manner.

### c. Industry Standards

The fact that an activity is conducted in the same way that similar, profitable activities are can also suggest a businesslike manner. See sec. 1.183-2(b)(1), Income Tax Regs. Here the Commissioner introduced no evidence of what a profitable "horse breeding/showing" business would look like, so there's nothing for us to compare Ms. McMillan's activity to. This factor favors Ms. McMillan.

### d. Adjusting Approach

Changing "operating methods, adopt[ing] * * * new techniques or abandon[ing] * * * unprofitable methods in a manner consistent with an intent to improve profitability" are also indications that a taxpayer conducted an activity in a businesslike manner. See sec. 1.183-2(b)(1), Income Tax Regs. Ms. McMillan's

[*35] last profitable year was 1988, and the record shows that she's sustained considerable losses every year since 2004. Ms. McMillan's decision to send Goldrush to Australia in 2007 seems like an attempted new approach to improve profitability, but given her plan of charging a $1,500 stud fee, she would've had to breed Goldrush over 100 times just to cover the losses on the record. The plan doesn't seem realistic in light of the fact that she was able to breed him an average of only once a year back when he was competing. The decades of losses Ms. McMillan sustained and the infeasibility of her only attempt to increase profitability together suggest an unbusinesslike manner.

On balance, we find that Ms. McMillan did not conduct her horse activity in a businesslike manner. This factor weighs against her.

### 2. Expertise of Taxpayer or Advisers

Consulting with industry experts and studying accepted business practices when preparing for an activity can suggest a profit motive. See sec. 1.183-2(b)(2), Income Tax Regs. The Commissioner didn't produce any evidence that Ms. McMillan *didn't* consult with any experts, so this factor can't favor him. What about Ms. McMillan's own experience? What's relevant here is expertise she had in the horse *business*, not just experience with horses. See McKeever v. Commissioner, T.C. Memo. 2000-288, 2000 WL 1297710, at *12. Ms. McMillan

[*36] testified that she's operated a horse business since the mid-1970s, but by her own account she's had only three profitable years--and none since 1988. We can't find that someone who suffered over 20 consecutive years of losses was an expert, so we won't find that Ms. McMillan's presumed reliance on her own experience counts in her favor. This factor is neutral.

### 3. Time and Effort Expended on the Activity

"The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit." Sec. 1.183-2(b)(3), Income Tax Regs. The Commissioner says Ms. McMillan didn't spend a significant amount of time on "horse breeding/showing" because the only related pursuits she reported were talking to people, watching videos of horses for sale, attending dressage competitions, riding at the barn, giving riding lessons, and lunging horses. But except for the lunging the record is silent about how much time she spent on these various pursuits. We therefore can't find that Ms. McMillan's time commitment was extensive.

What we do know is that many of these pursuits--including visiting the barn, riding horses, and attending dressage competitions--are recreational. That's especially true for Ms. McMillan, who has a genuine love of horses. Because we

**[*37]** don't know how much time Ms. McMillan spent on her horse activity, but we do know that the activity had substantial "recreational aspects," we find that this factor is neutral.

### 4. Expectation That Assets May Appreciate

An expectation that assets will appreciate can suggest a profit motive. See sec. 1.183-2(b)(4), Income Tax Regs. Ms. McMillan testified that she hoped to buy a horse and sell it for a profit, but in 2010 she didn't own one--or any other asset likely to appreciate. The only horse-related property she owned was the tack and riding outfits she stored at the barn, and we see no way she could've expected those to appreciate. This factor weighs against finding a profit motive.

### 5. Success in Similar Activities

"The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit." Sec. 1.183-2(b)(5), Income Tax Regs. The Commissioner has shown that although Ms. McMillan has been involved with horses for several decades, she's had very little financial success with them. She's had only three profitable years, none since 1988, and has suffered over $150,000 in losses since 2004. This factor weighs against finding a profit motive.

[*38]     6.     History of Income or Losses

Long periods of losses following the initial startup phase can indicate the lack of a profit motive. See sec. 1.182-2(b)(6), Income Tax Regs.; see also Golanty, 72 T.C. at 427. By 2010, Ms. McMillan hadn't made a profit on her horse activity in over 20 years, her losses in the preceding 6 years were considerable, and she hadn't reported any horse-related income whatsoever since 2004. This factor strongly suggests that Ms. McMillan's horse activity was not engaged in for profit.

     7.     Amount of Occasional Profits, If Any

Occasional profits can show a profit motive, but the size and frequency of profits relative to losses are what matter most. See sec. 1.183-2(b)(7), Income Tax Regs. "[S]ubstantial profit, though only occasional" is therefore a better indicator of a profit motive than "occasional small profit from an activity generating large losses," and even the opportunity to make a substantial profit in a speculative venture can tip this factor in a taxpayer's favor. Id. Ms. McMillan last turned a profit in 1988, and didn't successfully show or breed a horse during the decade preceding the tax year at issue. Without a horse in 2010, she had no way to make a profit in that year, either. Rather than a highly speculative venture that occasionally makes large profits--which many horse-related businesses are--

**[*39]** Ms. McMillan's horse activity was a consistent source of predictable losses, and in 2010 there was no indication that it could become otherwise. This strongly suggests that Ms. McMillan did not engage in her horse-related activities with the intent of making a profit.

### 8. Financial Status

"Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit." Sec. 1.183-2(b)(8), Income Tax Regs. Ms. McMillan earns a respectable income from her work as an IT professional, and has done so since at least 2004. Her "horse breeding/showing" expenses-- which she incurs in an activity with substantial recreational aspects--significantly reduce the taxable portion of that income. This factor weighs against finding a profit motive.

### 9. Elements of Personal Pleasure or Recreation

"The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved." Sec. 1.183-2(b)(9), Income Tax Regs. That doesn't mean that a business becomes a hobby just because the taxpayer enjoys it-- as we've said, "suffering has never been made a prerequisite to deductibility."

[*40] <u>Jackson v. Commissioner</u>, 59 T.C. 312, 317 (1972). At the same time, "where the possibility for profit is small (given all the other factors) and the possibility for gratification is substantial, it is clear that the latter possibility constitutes the primary motivation for the activity." <u>Dodge v. Commissioner</u>, T.C. Memo. 1998-89, 1998 WL 88175, at *7 (quoting <u>Burger v. Commissioner</u>, T.C. Memo. 1985-523, <u>aff'd</u>, 809 F.2d 355 (7th Cir. 1987)), <u>aff'd without published opinion</u>, 188 F.3d 507 (6th Cir. 1999).

In 2010 the possibility of Ms. McMillan profiting from her horse activity was nil. But the gratification Ms. McMillan received from training, riding, and caring for horses was clear, and her decades of involvement with dressage is an unmistakable and important part of her identity. No profit potential plus substantial personal satisfaction equals a heavy weight against our finding a profit motive.

The "goofy" regulation's nine factors lead us to the same conclusion that a more "holistic" approach would have: Ms. McMillan supported herself with her IT work and engaged in "horse breeding/showing" for personal reasons and did not expect to make a profit. She therefore can't use her horse-related expenditures to offset other income. And even if she did genuinely intend to turn a profit at some point, in 2010 she was at most in the initial phases of investigating potential

**[*41]** opportunities and hadn't actually commenced any "horse breeding/showing" business. This too would preclude her from deducting any expenses.

We therefore disallow any deductions for the expenses on her "horse breeding/showing" Schedule C.

III.    IT and Database Management Services

A.    Home Office

On her Schedule C for "IT and database management services" Ms. McMillan deducted a total of $8,045 for insurance, utilities, depreciation, and other expenses related to her home office, which she claimed took up 50% of her apartment. The costs of a home office that a taxpayer uses exclusively on a regular basis as the "principal place of business for any trade or business" are deductible. Sec. 280A(c)(1)(A); see also Hamacher v. Commissioner, 94 T.C. 348, 353 (1990); Heinbockel, at *62-*63. But the "exclusive use" requirement makes section 280A an all-or-nothing statute--if the taxpayer uses the home office mostly for business but also uses it for any other reason, there's no deduction. See Hamacher, 94 T.C. at 356-57. A taxpayer can, however, combine more than one trade or business to meet the exclusive use requirement if each trade or business also satisfies the rest of the test. See id. at 356.

[*42] We believe that Ms. McMillan's living room was her principal place of business for her "IT and database management services," but her own testimony shows that she also used it for other things. The most obvious of these was her horse activity, which we've found was not a trade or business in 2010. That alone defeats the section 280A "exclusive use" requirement, and means we can sustain the Commissioner's disallowance of Ms. McMillan's home-office deductions.

But even if her horse activity had been a trade or business in 2010 and her living room was its principal place of business, Ms. McMillan still wouldn't have met her burden of showing exclusive use. She testified that in addition to conducting her IT business and nearly "every aspect of [her] dressage horse business" from her home office, she also used it when working on her various lawsuits and for website administration--and in 2010 she had both a website related to her horse business and the site she agreed to take down as part of the HOA settlement. Even if her lawsuits and websites were somehow trades or businesses--and we find that they weren't--she still couldn't take the deduction if she used her living room for anything else, and her testimony that she never used any part of it for anything other than business is simply impossible for us to believe. We find it more likely than not that she did at least sometimes use her

**[*43]** living room as a living room, and we deny her section 280A deduction for that reason as well.

Finally, even if Ms. McMillan had shown that she was entitled to deduct the cost of her living room, she failed to substantiate it. Taxpayers who have the burden of proving entitlement to a deduction of any kind must have records that substantiate their expenses. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs. If they don't, we can estimate some expenses, but only if there's enough evidence to support an estimate. See Cohan v. Commissioner, 39 F.2d 540, 543-44 (2d Cir. 1930); Vanicek v. Commissioner, 85 T.C. 731, 742-43 (1985). There are no records in evidence that show Ms. McMillan actually incurred the costs she claimed for insurance, utilities, and "other expenses" or that would allow us to properly estimate such costs. This lack of records also leads us to sustain the Commissioner's disallowance of Ms. McMillan's home office deductions.

B.    Attorney's Fees, Again

On her Schedule C for the IT and database management business Ms. McMillan deducted the $11,998 she paid attorneys to handle the HOA suit and defend her against criminal charges. Taxpayers can deduct the ordinary and necessary expenses of carrying on a trade or business or otherwise producing income, secs. 162(a), 212(1), but not personal, living, or family expenses, sec.

**[\*44]** 262(a). Whether litigation costs are deductible business expenses or nondeductible personal expenses depends on "the origin and character of the claim with respect to which an expense was incurred." United States v. Gilmore, 372 U.S. 39, 49 (1963). If the claim arose "in connection with the taxpayer's profit-seeking activities," the fees are deductible. Id. at 48. If not, then they aren't deductible, regardless of "the consequences that might result to a taxpayer's income-producing property" from losing the case. Id. The Supreme Court formulated this test in Gilmore, 372 U.S. at 41-42, 51-52, where it found that the legal fees a husband incurred during his divorce trying to prevent his wife from taking his controlling interests in three car dealerships were personal because the origin of the wife's claim was the marital relationship, not an income-producing activity.

On brief Ms. McMillan concedes that she can't deduct the entire $11,998-- instead, she says she's entitled to deduct half of it because that's what we allowed her to do in the case involving her 2009 tax year. See McMillan II, at \*10-\*11. That holding resulted from the Commissioner's failure to show that the fees weren't deductible or challenge Ms. McMillan's claim that 50% of her apartment was a home office. Id. Here, however, Ms. McMillan has the burden, and she can't just rely on that prior decision.

**[\*45]** In Ms. McMillan's suit against her HOA neither her complaint nor the settlement she signed mentions any interference with her work. She neither sought nor received damages for lost earnings, and she did not testify that she suffered any. Her claims--breach of fiduciary duty, breach of covenants, and nuisance--originated from her status as a homeowner and an HOA member, not from her business activities. See Gilmore, 372 U.S. at 49. The amounts she spent pursuing those claims therefore aren't deductible.

We apply the Gilmore test with regard to criminal cases, too. Criminal-defense fees are deductible if "the crime is directly connected to the taxpayer's business," HIE Holdings, Inc. v. Commissioner, T.C. Memo. 2009-130, 2009 WL 1586044, at \*97 (citing Commissioner v. Tellier, 383 U.S. 687 (1966) (securities dealer defending against securities fraud)), aff'd, 521 F. App'x 602 (9th Cir. 2013), but not if "the crime arose out of the shareholder's activities and not out of the corporation's profit-making activities," id. (citing, among other cases, Peters, Gamm, West & Vincent, Inc. v. Commissioner, T.C. Memo. 1996-186 (securities firm defending against insider trading charges that didn't originate in firm's business)). The charges Ms. McMillan faced resulted from her attempt to infiltrate the apartment above hers to collect evidence for the HOA suit, which, as we've

[*46] found, lacked any connection to her business. Such behavior was not required by, or related to, any business she was engaged in.

We therefore find that the fees Ms. McMillan paid for her criminal defense were nondeductible personal expenses.

IV.   Penalty

The Commissioner says Ms. McMillan is liable for a section 6662(a) penalty. Section 6662(a) imposes a 20% penalty on tax understatements that are substantial, see sec. 6662(b)(2), (d), or that are due to negligence or disregard of rules and regulations, see sec. 6662(b)(1), (c). But a taxpayer who had reasonable cause for an underpayment and acted in good faith is not liable for the penalty. See sec. 6664(c)(1); sec. 1.6664-4(a), Income Tax Regs.

When the taxpayer is an individual, the Commissioner always has the initial burden of production on penalties, meaning he must present evidence that imposing the penalty is appropriate. Sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-47 (2001). He meets this initial burden for the substantial understatement penalty he asserted in his notice here because Ms. McMillan's deficiency is more than $5,000 and more than 10% of the tax she should've reported. See sec. 6662(d)(1)(A). He says he meets his initial burden on negligence too because he's shown that Ms. McMillan didn't report the $70,000

[*47] HOA settlement even though she knew how narrow the limitations on excludability were; that the HOA suit and her criminal case obviously weren't related to her IT business; that she deducted half the cost of her apartment even though she didn't use her home office exclusively for business; and that her horse activity clearly was not a trade or business because she didn't own a horse in 2010 and hadn't shown or bred one in around a decade. See sec. 1.6662-3(b)(1)(ii), Income Tax Regs.[11]

We agree.

Which brings us to the burden of persuasion. For penalties determined in the notice of deficiency, that burden is on the taxpayer--which means that once the Commissioner presents *prima facie* evidence that a penalty is appropriate, it's up to the taxpayer to show reasonable cause and good faith. See Higbee, 116 T.C. at 446-47; Sanderling, Inc. v. Commissioner, 66 T.C. 743, 757 (1976), aff'd in part, rev'd in part on other grounds, 571 F.2d 174 (3d Cir. 1978). Ms. McMillan doesn't argue that she had reasonable cause to deduct her legal fees and home-office expenses or that she did so in good faith--misunderstanding her burden with regard to the penalty determined in the notice, she says only that the

---

[11] Although he listed "substantial valuation overstatement" as a ground for the section 6662(a) penalty in the notice, he didn't argue it on brief.

**[\*48]** Commissioner didn't show that she *didn't* act with reasonable cause and good faith. She therefore hasn't made any showing of reasonable cause or good faith and can't use those defenses to escape the penalty related to her home-office and legal-fees deductions.

Ms. McMillan's argument is appropriate, however, with respect to the penalty the Commissioner asserted for the first time in his answer--namely, the portions related to Ms. McMillan's unreported settlement income and horse-activity deductions. Those are new matters, so the Commissioner has the burden of persuasion and must show that Ms. McMillan *didn't* have reasonable cause, act in good faith, or rely on substantial authority. See Rule 142(a); Sanderling, Inc., 66 T.C. at 757; McMillan II, at \*29; Snyder v. Commissioner, T.C. Memo. 2006-92, 2006 WL 1157874, at \*6.

While cross-examining Ms. McMillan the Commissioner's attorney established that she didn't consult any of her attorneys about her return position. She did, however, admit that she asked a CPA she'd retained in the 1990s whether the exclusion for pain and suffering awards was still in place, and he told her that it's now more "narrowly defined" and applies only when someone is "physically ill." Rather than suggest reasonable reliance that might excuse a section 6662(a) penalty, see sec. 6664(c)(1); Neonatology Assocs., P.A. v. Commissioner, 115

[*49] T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); sec. 1.6664-4(b)(1), Income Tax Regs., this testimony shows that Ms. McMillan knew that the exclusion she was relying on was limited, that she had reason to question whether she qualified for it, and that she didn't follow up to make sure her position was reasonable. It's also another reason to question her testimony about her physical symptoms--of which there's no contemporaneous evidence and the treatment for which she could not remember. The Commissioner therefore met his burden of showing that Ms. McMillan did not reasonably rely in good faith on professional advice, and that she had neither reasonable cause nor good faith in failing to report her settlement with the HOA.

The evidence also shows that when Ms. McMillan filed her 2010 return her horse activity hadn't made a profit since 1988 and lacked any way to do so. We therefore find that the Commissioner also met his burden of showing that Ms. McMillan lacked reasonable cause or good faith in claiming deductions for "horse/breeding showing."

But Ms. McMillan will luck out after all. Another part of the Commissioner's burden of production on penalties is showing that they were "personally approved (in writing) by the immediate supervisor of the individual making such determination." See sec. 6751(b)(1); Graev, 149 T.C. at 492-94.

**[*50]** Ms. McMillan put the accuracy-related penalty at issue in her pleadings and contested it on its merits in her briefs, but the Commissioner didn't introduce any evidence of such approval at trial. See Wheeler v. Commissioner, 127 T.C. 200, 208, 210, 212 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008). So, despite her substantial understatement and negligence, we don't sustain any section 6662(a) penalty against Ms. McMillan for 2010. See Ford v. Commissioner, T.C. Memo. 2018-8, at *6, aff'd, 751 F. App'x 843 (6th Cir. 2018).

Decision will be entered under

Rule 155.